Barrington Joseph **JOHNSON**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 21851.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 18, 1969.

Decided March 23, 1970.

Mr. William J. Lippman, Washington, D. C. (appointed by this court), for appellant.

Mr. Daniel E. Toomey, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty. at the time the brief was filed, Frank Q. Nebeker, Asst. U. S. Atty. at the time the brief was filed, and Nicholas S. Nunzio, Asst. U. S. Atty., were on the brief, for appellee.

On Rehearing En Banc *

Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, and ROBB, Circuit Judges, sitting *en banc.*

PER CURIAM:

This appeal comes to us following Appellant's District Court jury trial conviction for rape. 22 D.C.Code § 2801. Appellant stresses the factually-oriented issue of consent and alleges the Government's failure to establish a prima facie case of lack of consent by the complaining witness.

I

At trial the emphasis was on the conflicting testimony offered by the Complainant and Defendant on the issues of the actual physical act and consent thereto.

The complaining witness testified that she met Appellant at a gas station in the early morning hours when her car stopped as she proceeded to work at St. Elizabeths Hospital. Appellant offered to push her car the short distance to the Hospital parking lot, and after he did, he pulled her into his car and left the area. Complainant testified that she was "scared to death" but made no attempt to

scream at this point. She testified that Appellant kept repeating that he would not hurt her if she did not scream. Appellant stopped at another gas station to purchase gasoline, and he placed his arm around her neck again telling her not to scream. The Complainant, who at that time suffered from a hyperthyroid condition, testified that the pressure of the Appellant's arm against her thyroid gland made it more difficult for her to breathe. He thereupon drove to a deserted street saying that there was "no use screaming because no one would hear"; it was here that the attack took place. As to her mental and emotional state at the time, she related that: "[D]uring the whole time, I was scared to death because I really thought he was going to kill me. I never thought he would take me back to work." She did not cry out, although she testified that she kept begging him to take her back to work.

Thereafter, Appellant drove her back to St. Elizabeths Hospital. Complainant testified that she then, at the Appellant's demand, gave him her car keys and took from him a piece of paper containing his phone number and the name "Charles." Next she went into the hospital to report the incident to her supervisor and to the police who were summoned to the scene.[1] An examination was made at D. C. General Hospital. That afternoon she was returned to St. Elizabeths parking lot to identify Appellant who had returned to the lot in the same car that she had described that morning.[2]

To corroborate Complainant's testimony the Government called the director of the pathological department of D. C. General Hospital whose testimony confirmed recent relations; an FBI spe-

---

* After the hearing and decision of this case by a division of the court, and upon the filing of a petition for rehearing by the division, the case was *sua sponte* placed *en banc*, but without further argument or briefing.

1. On the return to the Hospital Appellant said that he would return to St. Elizabeths that afternoon to help her start her

car but he thought she would "probably have policemen everywhere"; she replied that she would not.

2. At the time of his arrest, Appellant had Complainant's car keys in his possession. The Complainant also identified as hers a pair of white gloves found in Appellant's car at the time of his arrest.

cialist in the microscopic examination of fibers and textile materials testified that he found numerous woolen fibers on Complainant's clothing having the same characteristics as the fibers of the sweater Appellant was wearing at the time of the attack.

The principal thrust of Appellant's case at trial was that although he admitted meeting the Complainant, pushing her car, and returning to the Hospital parking lot to help her start it that afternoon, she had never been in his car and he had no contact with her.[3]

Appellant admitted having Complainant's car keys at the time of his arrest but said that she had given them to him so that he could return to start her car. He also testified that he could not recall whether Complainant was wearing gloves that morning, and he had no recollection how her white gloves had come to be in his car at the time of his arrest.

## II

As noted above, the focus of Appellant's case on appeal is his assertion that the Government failed to establish a prima facie case of lack of consent by the complaining witness. As an alternative to this proposition, he also contends that even if the trial court did not err in failing to take the case from the jury and directing a verdict of acquittal, the evidence in its totality was clearly insufficient to sustain the jury's verdict of guilty.

Before the Appellant can effectively challenge the trial court's decision to send this case to the jury, he must establish that at the point when the motion for acquittal was made the Government had not introduced

> such evidence that reasonable persons *could* find guilt beyond reasonable doubt. It is not a requirement that the evidence *compel*, but only that it is

capable of or sufficient to persuade the jury to reach a verdict of guilt by the requisite standard.

Crawford v. United States, 126 U.S.App. D.C. 156, 158, 375 F.2d 332, 334 (1967) (emphasis in original); *accord, e. g.,* Thompson v. United States, 132 U.S.App. D.C. 38, 405 F.2d 1106 (1968); Curley v. United States, 81 U.S.App.D.C. 389, 160 F.2d 229, cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

In challenging the validity of the trial court's determination, Appellant presents a staccato list of points which are said to militate against a finding of non-consent. Among those offered are the Complainant's failure to forcefully resist, her failure to scream out or attempt escape, the fact that she removed her own clothing, the absence of any weapon, and the fact that the Appellant later returned to the hospital parking lot to help her start her car. Indeed, like many records in rape cases, the evidence is not always clear-cut. Nevertheless, the evidence presented in the Complainant's testimony was not in itself incredible as was that of the complaining witness in Farrar v. United States, 107 U.S.App.D.C. 204, 275 F.2d 868 (1960), a case upon which Appellant places great reliance.

In denying the Government's petition for rehearing *en banc* in *Farrar* and thereby preserving this court's earlier reversal of a conviction for rape, then Chief Judge Prettyman explained that acquiescence may be deemed nonconsensual in the absence of force if the victim is put in genuine apprehension of death or bodily harm. The determinative factor in *Farrar* was that "[t]he complaining witness rested her claim of fear upon a simple physical fact—a knife." *Id.* at 212, 275 F.2d at 876. "The only basis for fear advanced by the prosecutrix was the knife; she suggested no alternative cause for fear." *Id.* at

---

3. In his closing argument, trial counsel for Appellant argued both the absence of any sexual encounter and the issue of non-consent:

> One more thing: I'm going to argue consent, and I'm going to argue consent

because, of course, there is evidence of it, but I don't concede one second that the act of intercourse took place. I want you to understand that. The defendant has this right.

213, 275 F.2d at 877. When this court found it incredible that the complainant had been coerced by a knife for a two or three hour period and had "submitted" to multiple acts of intercourse, and yet never saw the knife, the conviction could not stand in the absence of any viable alternative cause for the prosecutrix' "fear" of her attacker. Indeed, the sitting division in *Farrar* found that her participation in the acts of intercourse were not induced by threats or "by words of any sort." *Id*. at 204, 275 F.2d at 868.[4]

■■ In the instant case, the Complainant's relation that she was "scared to death because I really thought he was going to kill me" was not based on a nondiscoverable weapon or any other theory of fear which was incredible on the basis of her own testimony. It was based on a *general fear of her assailant* who had dragged her from her car, kept his arm around her neck when they stopped for gas, drove her to a deserted location, and told her it would be useless for her to scream because no one would hear. The Appellant was not unaware of complainant's fright; she testified that he had "said that he knew I was scared because I was so nervous." In these circumstances, this court's observations in Ewing v. United States, 77 U.S.App. D.C. 14, 16, 135 F.2d 633, 635 (1942), cert. denied, 318 U.S. 776, 63 S.Ct. 829, 87 L.Ed. 1145 (1943) (emphasis added), are worth reiterating:

There are cases, especially older ones from other jurisdictions, which seem to require resistance to the victim's ultimate physical powers in order to sustain conviction for this crime. But the law is no longer in this last-ditch stage. Whatever it may have been in other times, it is generally settled now that *consent is not shown when the evidence discloses resistance is overcome by threats which put the woman in fear of death or grave bodily harm*, or by these combined with some degree of physical force.

Therefore, despite Appellant's protestations of "an insurmountable evidentiary gap on the consent issue," we feel that the trial judge correctly viewed the evidence as such "that a reasonable mind might fairly have a reasonable doubt *or might not* have such doubt" on the question of consent. *Crawford, supra,* 126 U.S.App.D.C. at 158, 375 F.2d at 334 (emphasis in original). The District Judge was required to view the evidence at the close of the Government's case in the light most favorable to the Government's position.[5] Having made this determination based on testimony which was not inherently incredible, the case was for the trier and not the trial judge, and the motion for directed verdict of acquittal was properly denied.

■ Appellant's contention that the totality of the evidence adduced at trial was insufficient to sustain the jury's verdict is also unavailing. Appellate counsel makes a concerted attack on the credibility of the Complainant, pointing out various specific inconsistencies between her testimony and that of other witnesses,[6] and even raises a "number

---

4. Other facts which bore on the credibility of the complaining witness' testimony in *Farrar* also distinguish it from this case. In *Farrar* the girl was accosted on a public street and walked two or three blocks to her assailant's room; both the street and room were lighted, thereby facilitating her observation of any weapon she thought he had; the incident stretched over a two to three hour period during which time her assailant left her alone in his room.

5. *See* Thompson v. United States, *supra*; Crawford, *supra*; Thomas v. United States, 93 U.S.App.D.C. 392, 211 F.2d 45, cert. denied, 347 U.S. 969 (1954); Curley, *supra*.

6. Examples are: her statement that Appellant arrived at the gasoline station after she did as contradicted by the attendant's relation of the sequence of arrivals; her denial that she asked for leave when she arrived at the supervisor's office as con-

of nagging questions" concerning certain witnesses who were not called by the prosecution *or defense.*[7] Admittedly, the trial and this record is not a model of symmetrical components—but difficult criminal trials seldom are; this is inherent when none but victim and attacker are present. What does emerge from the record, however, is the critical importance of credibility on the key issue of consent. Present counsel recognizes this reality by conceding that the consent issue focused on the Complainant's credibility; he argues:

> The only evidence to rebut the strong inference of consent * * * is the complaining witnesses's. * * * *Obviously, the jury believed the testimony.* Equally obviously, however, the jury should not have believed her testimony because (1) her alleged fear was not shown to have a reasonable basis and (2) her story was inherently incredible, i. e. inconsistent with other testimony and contradicted by human experience.

Brief for Appellant at 19 (emphasis added).

■ We do not agree that the circumstances which surrounded her abduction, the isolated locale of the actual attack, and the threats of her attacker were an insufficient basis for reasonable fear if the victim's testimony is credited. Nor can we agree that her testimony was inherently incredible. The jury was properly allowed to consider and resolve the issue of the credibility of the key witnesses in deciding whether the Complainant's will had in fact been overborne. Of all the issues which are in the highest order for a jury one is hard pressed to suggest one more firmly intended and more plainly suited for jury determination than that of credi-

bility. We cannot say their verdict on this point was without reasonable foundation, and whatever our own resolution might be were we to decide the fact issues—had we been the triers—this verdict was within the proper range of permissible alternatives for the finders of fact.

■ Testimony reduced to the printed words can have the appearance of truth when not one of those who saw and heard the witness believed him; to the contrary a printed version which may arouse skepticism in the reader can reflect testimony which, to those who heard it, was filled with the clear ring of truth and hence believed. It is a rare case indeed, when twelve jurors *believe* and the trial judge who also saw and heard, fails to exercise his power to set the verdict aside, that an appellate court ought to intervene. That authority is a reserve power to be used only to prevent manifest injustice. This record, viewed as a whole—as the jurors viewed it—in no sense suggests any miscarriage of justice.

■ As we noted in *Crawford, supra,* the standard for the jury's determination of guilt beyond a reasonable doubt is stricter than the test to be applied by the trial court in determining whether a case may go to the jury at all. But when evaluating the basis of the jury's resolution of the issue of guilt, we must remember that the jury may properly attach detrimental significance to the defendant's own testimony or evidence introduced on his behalf. We recently observed:

> We cannot speculate whether the jury assessment of Appellant's credibility may have tipped the balance. Assuming, arguendo, that it did, the jury could properly evaluate his testi-

trasted with the supervisor's recollection to the contrary; her testimony that the crime took place on the front seat of Appellant's car whereas the expert witness was unable to find any strands of thread matching her clothing on the seat.

7. Examples include the Government's failure to call the Complainant's husband or

the attendant from the second gas station where Appellant stopped when she was in the car. However, there is no indication that these witnesses were not equally available to the defense. See p. 655 *infra.*

mony in a way that would strengthen the Government's case. * * * This is not to suggest that Appellant's testimony could be relied upon by the trial court, or by a reviewing court, in evaluating the sufficiency of the Government's case against a challenge by motion for a directed verdict of acquittal. To draw the homely analogy, evidence introduced by an accused in his own defense cannot give life to a "dead horse," but it can invigorate a weak one.

Thompson v. United States, *supra*, 132 U.S.App.D.C. at 39–40, 405 F.2d at 1108.

■■■ Without assuming so, it is possible that the jury was unconvinced by Appellant's statements that the complaining witness was never in his car and that he never had relations—consensual or not—with her. He could not explain the presence of her gloves in his car and the expert testimony which linked fibers of his clothing with those found on the Complainant's garments. It is quite true that a defendant has the right to argue inconsistent defenses as Appellant did here, *see* Whittaker v. United States, 108 U.S.App.D.C. 268, 281 F.2d 631 (1960), and note 2 *supra*; this often represents a tactical decision to be made at trial. However, it would not be surprising if this position reflected unfavorably on Appellant's credibility and weighed against the jury's favorable consideration of the consent issue when they considered the totality of the evidence.

### III

■■■ Appellant also claims that the Government suppressed certain relevant evidence. Appellate counsel argues that the prosecution failed to produce the piece of paper allegedly containing Appellant's name, or the name "Charles", and Appellant's phone number. As noted above, the prosecution readily admitted the loss of this paper in police custody and the jury was free to draw its own subtle inferences from this explanation. A set of battery cables allegedly recovered from Appellant's car at the time of his arrest were similarly claimed to have been suppressed. On this point, suffice it to say that defense counsel was made aware that the cables were possibly in police custody at the Eleventh Precinct. No effort was made to subpoena them pursuant to Rule 17 (c), Fed.R.Crim.P.[8]

We have considered Appellant's other contentions of error and find in them no basis for disturbing the judgment of conviction.

Affirmed.

FAHY, Senior Circuit Judge, with whom BAZELON, Chief Judge, and WRIGHT, Circuit Judge, join, dissenting. ROBINSON, Circuit Judge, joining in Part I of this dissenting opinion, would reverse on the ground that the evidence was insufficient to sustain appellant's conviction.

Appellant has been convicted and sentenced to serve six to eighteen years in prison for rape, a crime I am convinced has not been proved as the law requires, either by the evidence or as free of reversible error due to the case having been tried as though rape were a capital crime.

### I.

Appellant's conviction rests upon the testimony of the complaining witness, not significantly strengthened by the testimony of others. She testified that she was a nurse at St. Elizabeths Hospital. Driving to her work there one morning about 6 a. m. her car became disabled near a gas station. She went to a telephone booth and called her husband. At about the same time appellant drove into the same station and offered her his help, which she accepted. With his car he pushed her car with her

---

8. The panel which heard this case in the first instance commented adversely upon the inclusion in appellant's brief on appeal of matter outside the record, and granted appellee's motion to strike the offending matter. We adhere to that disposition for the reasons advanced by the panel in its opinion.

in it to a parking place on the grounds of St. Elizabeths near the building where she worked. As she was getting out of her car appellant went over to it and pushed her back in, telling her to move over so he could come in on the same seat.[1] She pointed out the "console" barrier which prevented this. He then took hold of her arm and pulled her into his car. There was no outcry, no word of protest, no word or act of resistance.[2] Still holding her arm he drove off to a service station telling her on the way that she would not be hurt if she did not scream.[3] He stopped at a nearby gas station and there put his arm around her neck. The gas station attendant came right up to the car window. Appellant took money out of his pocket and paid through the window. Her mouth was free; only his arm was around her neck. No protest. No resistance. No word uttered or sign made. He drove off again to a secluded spot. On the way he told her where he worked and lived. Also during the ride he told her to take off her underclothes.

No word of protest.[4] When they had stopped at the scene of the alleged crime he again told her that there would be no use in screaming and continued to converse with her. Responding to his questions, she told him she was married and had three children, but that she did not love her husband. He again told her to take off her underclothes and she complied. No word of protest. No importunity.[5] No force.

He drove her back to her place of work. He told her he would come back at three o'clock to start her car for her but she would probably have policemen. She said, "No, I wouldn't." He then asked her for the key to her car. She took it off the key ring and gave it to him. He asked her for a piece of paper to write on, which she gave him out of her purse. He wrote on it his correct phone number and a name—Charles—not his own, and gave it to her. She told him her name was "Luella." He did return as he said he would, with battery cables to help get her car started, and was arrested.[6]

1. On cross-examination the complaining witness responded to questioning about this as follows:
Q. Now, what did you say, if anything, when he pushed you back in?
A. I don't remember saying anything. She repeated this. Then this occurred:
A. He told me to move over.
Q. What did you say in response to that, if anything?
A. I said I couldn't move over.

2. On cross-examination she answered defense counsel's inquiries as follows:
Q. Did you scream at any time from the time he took you from your car to his?
A. No I didn't.
Q. Did you make any noise?
A. No I didn't.

3. She also testified that "he said that he knew I was scared because I was so nervous" and that she explained her condition to appellant as follows: "I told him I had a thyroid condition and this made me nervous anyway."

4. On cross-examination the complaining witness explained:
Q. Well, when he first asked you to take your underclothes off, what did you tell him, if anything?

A. I didn't say anything.
Q. You didn't say anything. You pretended like you didn't hear him?
A. I just didn't say anything.

5. She testified as follows on cross-examination:
Q. * * * Now, at any time during this entire time, did you ever tell him no?
A. No what?
Q. That you didn't want to do this, whatever he was going to do?
A. No, I only kept begging him to take me back to work.
Q. That's all. And you never said no; you never tried to stop him; you never put your hand up; and you never cried out. Is that correct?
A. He had told me if I wouldn't scream, he wouldn't hurt me.

6. She testified that she went immediately to her supervisor to report the incident; however the testimony of her supervisor places her arrival in a different light. She testified that when the complaining witness arrived she was emotionally upset and asked for time off, explaining that she didn't feel that she could perform her duties. Later, in a private inner room, when the supervisor asked her what had

The crime of rape insofar as applicable to this case is defined in our Code as follows:

* * * carnal knowledge of a female forcibly and against her will * * * 22 D.C.Code § 2801.

Clearly no "forcibly" carnal knowledge occurred—no force at all as the term is used in the context of a rape statute. Perhaps persuasion or seduction, or possibly coercion. But no "forcibly" carnal knowledge.

The testimony regarding force is that appellant pushed the complaining witness into her car at St. Elizabeths,[7] that he held her arm on the way to the gas station, and there put his arm around her neck. No further description of this conduct is given, and, moreover, these incidents were remote in time and place from the carnal knowledge, and of course do not constitute carnal knowledge forcibly or against her will. Even if her evidence shows that in a sense in the end she might have acted "against her will" it does not show that her submission was also "forcibly" imposed upon her, as required by our Code.

In the above situation the Government advances the principle that the law has engrafted upon the statutory definition of rape a substitute for "forcibly and against her will," namely, fear of death or serious bodily harm. This is a recognized substitute. Farrar v. United States, 107 U.S.App.D.C. 204, 211, 275 F.2d 868, 875 (1960) (Mem. of Chief Judge Prettyman on denial of rehearing en banc). But equally well recognized is the corollary that this fear, being as it is a substitute for "forcibly and against her will," must be proved by objective conduct which shows a substantive reason for fear of death or serious bodily harm. This is missing in this case. We have simply her own testimony long afterwards that she was "scared to death because I really thought he was going to kill me." This expression at trial of her subjective thought or feeling is not the substitute recognized by the law for "forcibly and against her will." The fear must reside in objective conduct proved by evidence adduced before the jury. On the issue of proof beyond a reasonable doubt that she feared death or serious bodily harm the conduct of appellant, as she described it, must be judged by her reaction to it at the time, which we have described, and by its character considered alone. Considered in this way the evidence points to no conduct which created fear of death or serious bodily harm, much less proof of it beyond a reasonable doubt. Her later testimony of her mere subjective feeling is insufficient to establish such conduct.

The statement that he said if she did not scream she would not be hurt loses all possible support for finding she feared for her life or serious bodily harm when she offered no resistance by either word or action and by no word even, much less action, sought to dissuade him. To permit the jury to read into her testimony a basis for such fear, inconsistent with his actual conduct shown by her testimony, and equally if not more importantly, inconsistent with her own contemporaneous reaction to his conduct, is to permit a conviction without support in law, and calls upon the court to assume responsibility for setting it aside.

The case requires a distinction to be drawn between a result which turns upon the credibility of the complaining witness and, accepting her credibility, the sufficiency of the evidence to establish the crime charged. See Farrar, supra, 107 U.S.App.D.C. at 211, 275 F.2d at 875. This distinction, especially important in a charge of rape alleged to have been committed with no evidence of objective conduct to support its essential ingredient of force or fear of death or serious bodily harm, is overlooked by the court. Its decision is reached by ac-

happened and why she was late and thought she needed the day off she explained about being "accosted."

7. There is no testimony he "dragged her from her car", stated in the majority opinion.

ceptance of the credibility of the complaining witness. Accepting such credibility, however, as we have done as to what she says occurred, leaves proof of the crime lacking. More was owed to herself and to the law than appears from the evidence to support a conviction of rape, and the conviction properly can stand only upon evidence in the record.

## II.

Upon the above analysis I think appellant is entitled to reversal and dismissal of the indictment. Assuming, however, that the court is justified in its disagreement with this position, then in any event I think he is entitled to a new trial because the jury was erroneously permitted to consider the case as one in which the death sentence was permissible. At the beginning it was impressed upon the jury that this was a capital case, and again when the court so charged the jury as the trial was ending. The jury was deliberately chosen only from among those willing to attach the death penalty in case of a verdict of guilty,[8] and the court charged the jury that although the Government was not seeking the death penalty, "you may, if you wish to do so, add the words, 'with the death penalty,' to your verdict of guilty, if you find him guilty."

We know now, due to the subsequent decision of the Supreme Court in United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), that this was error—that the death provision in our rape statute, like the similar provision in the kidnapping statute involved in *Jackson*, derogated in an unconstitutional manner from an accused's right to trial by jury. After *Jackson* we so held in Bailey v. United States and Humphries v. United States, 132 U.S.App.D. C. 82, 405 F.2d 1352 (1968). Concededly, therefore, it was error in the present case to compose the jury as though this were a capital case, and, also, to instruct the jury that it was. Nevertheless our court treats as harmless such a serious error because the jury did not add the death sentence to the verdict of guilty.

Over my dissent a division of this court took the same position in *Bailey* and *Humphries, supra,* saying there, "no reasonable possibility of prejudice existed to appellants by reason of the jury being instructed that the statute permitted them to impose the death penalty," 132 U. S.App.D.C. at 87, 405 F.2d at 1357. I also dissented from a similar ruling in Duckett v. United States, 133 U.S.App. D.C. 305, 306, 410 F.2d 1004, 1005 (1969). And *see* Springfield v. United States, 131 U.S.App.D.C. 166, 403 F.2d

8. During the voir dire examination the prosecuting attorney explained to the panel of prospective jurors: "This is a criminal case. It is a capital case." Again, still during the voir dire, he repeated: "Ladies and gentlemen, this is a capital case. The Government is not asking for the death penalty, in this case however. * * * My attempt is to question the jury concerning, number one, are you opposed to capital punishment? If you are opposed to capital punishment, would this preclude or prevent you from returning a verdict of guilty if the evidence so showed guilt if you were selected as a member of the panel to try this case?

"Let me repeat it: I am asking you whether you are for or against capital: the question is if you are against capital punishment, would this prevent you from returning a verdict of guilty if you were selected as a juror in this case?

"The reason I ask the question is because the Court at the end of the case will instruct you that you can return a verdict of guilty with the recommendation of the death penalty.

"My question is whether this would prevent you from returning a verdict of guilty, assuming that you are against capital punishment, and that this would prevent you from returning a verdict of guilty and guilty alone? Is there any such juror present?"

Only juror Mrs. Johnnie M. Lyles answered: "Yes, it would if I thought the penalty would be death." Asked then by the prosecuting attorney if the jury could not decide on the penalty but just as to guilt or innocence would this prevent her from returning a verdict of guilty. She said it would. A little later she said: "You say if I felt that he was guilty, would I say not guilty if I thought he would get the death penalty?" The prosecuting attorney said: "That is correct." And she said: "Yes, that is what I said."

572 (1968), where the conviction was upheld but where the court pointed out that the evidence of guilt was so strong that the verdict was compelled. Clearly that view cannot absolve the error of prejudice in the present case.

That it is reversible error to try a defendant for a more serious offense than one for which he is validly triable was pointed out in an opinion by Mr. Justice Fortas, in which Chief Justice Warren and Mr. Justice Douglas joined, in Cichos v. Indiana, 385 U.S. 76, 80, 87 S.Ct. 271, 17 L.Ed.2d 175 (1966). Though a dissenting opinion the majority of the Court cannot be said to have been in disagreement, since they disposed of the case on another ground, as I explained in *Bailey* and *Humphries, supra,* 132 U.S.App.D.C. at 90, 405 F.2d at 1360. The Fortas opinion states the matter as follows:

> First, it exposed [defendant] to the hazards of prosecution and conviction for the more onerous offense. Second, it again gave the prosecution the advantage of offering the jury a choice —a situation which is apt to induce a doubtful jury to find the defendant guilty of the less serious offense rather than to continue the debate as to his innocence. See United States ex rel. Hetenyi v. Wilkins, 348 F.2d 844 (C.A. 2d Cir. 1965), cert. denied, [Mancusi v. Hetenyi, 383 U.S. 913, 86 S. Ct. 896, 15 L.Ed.2d 667 (1966)].

*Cichos, supra,* 385 U.S. at 81, 87 S.Ct. at 274.

In the *Wilkins* case referred to, Circuit Judge Marshall, now Mr. Justice Marshall, wrote the opinion. An instruction on first degree murder was given the jury in a case in which it was held the accused was not then triable for a crime more serious than second degree murder. The verdict was guilty of the latter; nevertheless the Court stated:

> [I]t is entirely possible that without the inclusion of the first degree murder charge, the jury, reflecting a not unfamiliar desire to compromise might have returned a guilty verdict on the first degree manslaughter charge on the same evidence. There is, of course, no basis for predicting with any confidence, that this would have been the outcome of the third trial if Hetenyi had not been reprosecuted for first degree murder; but neither is there any basis for predicting, with any confidence, that this would not have been the outcome. To make this latter prediction on the basis of the sufficiency of the evidence would be to ignore reality and, in effect, to have judges make the choice entrusted to the jury.

*Wilkins, supra,* 348 F.2d at 866.

I find no answer to this reasoning. The prosecution here obtained a jury willing to add the death sentence to a guilty verdict. No prospective juror not willing to attach the death sentence was accepted. The case was described by prosecutor and court as capital. While the Government did not request the death sentence neither did the Government disavow it or request that it not be added.

We cannot surmise there was no likelihood of the jury considering the availability to them of the death sentence. We have no basis for such a surmise; and it is the erroneous availability of the death sentence, not the likelihood of its rendition, that gives rise to the prejudice. It may have exerted an undiscernible influence on jurors in deciding whether to find guilt, but without the death sentence, or not guilty. One or more jurors, with his or her attitude about the crime of rape reinforced by the statutory provision for a death sentence, might have been so influenced. As stated by the Second Circuit in *Wilkins, supra,* 348 F.2d at 867, it is sufficient if there is "a reasonable possibility" of prejudice.

For the court erroneously to give the jury a range of verdicts more severe than the law allows in the case on trial is for the court erroneously to influence the jury adversely to the accused. As

a result the verdict rendered may be more severe than otherwise it would have been, even if not the most severe permitted by the erroneous instruction.

