Ronald HARLEY, Appellant,

v.

UNITED STATES, Appellee.

No. 9901.

District of Columbia Court of Appeals.

Argued Nov. 10, 1976.

Decided May 19, 1977.

Robert Case Liotta, Washington, D.C., appointed by the court, for appellant.

Neil A. Kaplan, Asst. U. S. Atty., Washington, D.C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and William D. Pease, Asst. U. S. Attys., Washington, D.C., were on the brief, for appellee.

Before KELLY, KERN and GALLAGHER, Associate Judges.

KELLY, Associate Judge:

Appellant Harley was convicted by a jury of assault with intent to rape and sodomy.[1] On appeal he contests the denial of a motion to suppress his photographic, lineup, and in-court identifications by the complaining witness, and contends also that the government failed to prove the complainant's lack of consent. We find no merit in these contentions and affirm.

Shortly after 11:00 p. m. on the evening of February 10, 1974, the complainant neared the intersection of Fifth and K Streets, S.E., en route to her home at 1024 Fourth Street, S.E. For a period of five or so seconds she observed a man walking toward her from a distance of about twenty feet. The man, whose features were well illuminated by the streetlight, approached and engaged complainant in a brief conversation. Suddenly he grabbed her by the hair, struck her in the eye, and dragged her some twenty-five feet into a nearby playground. For the next forty-five minutes to an hour the assailant engaged in various types of specifically described sexual activity with the complainant, including oral and anal intercourse. At no time did he threaten her with a weapon, but he did cover her mouth from time to time, telling her to be quiet. Once they were in the playground, it was so dark that the victim herself testified that she could not see her hand in front of her face, although other testimony indicated that there was some visibility at the time of the assault. During the attack, two police officers walked to within thirty-five feet of the place where the assault was occurring, but the complainant did not struggle or call out. Additionally, a man walked his dog for five to ten minutes some forty-five feet away from the scene and the complainant did not attempt to catch his attention. The complainant testified she was afraid to cry out or to struggle.

. After her assailant fled, the complainant walked to her home and told her mother what had occurred. Initially her mother doubted her story, suspecting that she was making an excuse for her late return from her boyfriend's home. The mother noticed, however, that her daughter had a red eye, was cold, crying and shivering, and that her clothing, shoes, purse, and hair were covered with mud and leaves. She called the police.[2]

1. D.C.Code 1973, §§ 22–501, –3502, respectively.

2. The parties stipulated that (1) the soil on complainant's coat favorably compared with the soil at the scene of the offense, while the soil on appellant's coat did not; (2) there was an absence of appellant's pubic hairs or clothing fibers on the complainant's body or clothing, and vice versa; and (3) there was a general lack of medical evidence from an examination of complainant suggestive of recent violent penetration, but there was a possibility of recent sexual intercourse.

The complainant told the police upon initial inquiry that her assailant was a Negro male named "Johnny" in his middle thirties, 5'7" or 5'9" tall,[3] weighing 120 to 130 pounds, with a light complexion, short close-cut hair, a small moustache, pimples on his face, and wearing a three-quarter length dark coat, dark trousers, and a plaid shirt.[4] At the suppression hearing complainant testified that she had described her assailant as being 5'5" tall, slim, with light brown skin, a short bush haircut, in his "early twenties or middle thirties." She said she told the police her assailant was wearing a plaid midi-length coat, dark pants, dark shoes, and a closed shirt, and further described the coat as a black and white knee-length midi coat with a wide V-shaped collar.

The day after the attack, Detective Kenneth Curry, Jr. of the Metropolitan Police saw appellant being brought into the police station after his arrest for another offense. He noticed that appellant matched the complainant's description of her assailant and included a polaroid snapshot taken of the appellant in a photographic array he showed the complainant later on that evening, giving as his reason the fact that no other photograph of the appellant was available. Unfortunately, this snapshot differed somewhat from others in the array since the others were all standard mugshots with full and profile views of head and shoulders, with a number on each person's clothing. Appellant was also pictured front and side, but with slightly more torso showing and without a number. In addition, he was shown in the photograph wearing a black and white small-checked plaid coat. Detective Curry admitted that he was aware of the similarity of the coat in the photograph to that described by the complainant and that he wanted the appellant to appear "as near as possible the way he looked at the time of the offense. . . ." Finally, appellant's picture was not bordered with dark edges as were the others.

## I.

Having reviewed the disputed photographs, which are included in the record on appeal, we conclude that the trial court correctly determined that the array, while not ideal, was not in and of itself so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Marshall v. United States,* D.C. App., 340 A.2d 805 (1975).

Appellant claims that the photographic identification was tainted by the remarks of Detective Curry to the complainant before she viewed the photographs. The record reveals that the complainant was seated for approximately twenty minutes near four detectives who intermittently discussed not only this case but also other assaults in the same neighborhood. It is not clear whether any of this discussion was overheard by the complaining witness before she was shown the photographic array, but she made no identification from the initial book of pictures she was shown. When she was shown the stack of ten photographs described above and was told by Detective Curry that he had included in the array the picture of a suspect arrested for another offense whom he believed to have been the man who assaulted her,[5] complainant tentatively identified number four [the appellant]. She was told to look at the rest of the pictures. She did so, then returned to number four and identified him positively as her assailant. Detective Curry admitted at the suppression hearing that he might also have told the complainant *after* she had selected appellant's photograph

---

3. PD Form 251 listed the height as 5'5" or 5'6".

4. PD Form 251 noted that the shirt was red.

5. "I believe, sir, I said—I told her, 'There is a subject who was arrested for another offense and we believe him to be the one who assaulted you that day. I have his picture among some other pictures. I would like you to look at them.'" [Tr. at 14.]

that the man she had identified had raped other women in her neighborhood.[6]

Complainant testified that she had chosen appellant's picture from the array because she recognized his face, and not because of the distinctive coat or the format of the photograph. The trial court found at the conclusion of the hearing that while Detective Curry's remarks were "deplorable", in view of the complainant's fairly detailed description of her assailant and the reasonableness of the array, the identification procedure as a whole was not impermissibly suggestive.[7] We find no error in this ruling and since there was no independent flaw in the subsequent lineup,[8] we uphold the validity of the admission of that identification testimony as well.

Appellant has argued in his brief that this case is closer on its facts regarding identification suppression to *United States v. Sanders,* 156 U.S.App.D.C. 210, 479 F.2d 1193 (1973), than to the oft cited *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In *Sanders,* the complainants, employees of a restaurant which was robbed at gunpoint, gave uncertain descriptions of the robber. They had had limited opportunity to observe the robber at the time of the offense although they spent more than ten minutes in his presence. Of the eight photographs shown them by the police, only one showed a subject who was stout, with facial hair and a dark complexion, as the witnesses had described their assailant. Sanders was the only subject who appeared at both the photographic array and lineup, and there was some discrepancy between the descriptions given and Sanders' characteristics. The identification witnesses had by their own admission very

limited recall of the robber either at the time of the robbery or at trial. Finally, a police officer had indicated to the witness that one member in the photographic array was strongly suspected to be the offender. The court, recognizing that "[t]he elements of suggestiveness must be considered in the totality of the circumstances," found overall that the identification procedures in that instance did not pass constitutional muster and found further that there was no adequate independent source for an in-court identification. *United States v. Sanders, supra,* 156 U.S.App.D.C. at 214, 479 F.2d at 1197.

In this case, on the other hand, the complainant was with her assailant for about an hour in close physical proximity and contact. She testified that during the period she was in the playground she could see his face, which was at times only five or six inches from hers. She gave a fuller description than was given in *Sanders* [comparable to that given in *Neil v. Biggers, supra* ], and unlike the witnesses in *Sanders,* she never waivered in her certainty of her identification of appellant. With these factors viewed together, there was in this case no substantial likelihood of irreparable misidentification and it was properly left to the jury to weigh the identification testimony as they saw fit.

## II.

■ Appellant also argues that the government presented insufficient evidence of lack of consent for the case to go to the jury. In this regard, we note that consent is not a defense to the crime of sodomy. *United States v. Buck,* D.C.App., 342 A.2d

---

**6.** Appellant argues that such remarks served to increase the likelihood that the complainant would pick the same person in a lineup that she had chosen from the photographic array, since her conclusion from the remarks would be that she had chosen a man who was suspected in a number of offenses and therefore, was likely to have attacked her. *See Marshall v. United States, supra.*

**7.** The trial court also made an alternative finding of independent source for any in-court iden-

tification because of complainant's ability to describe her assailant so closely, a description which fit appellant so well.

**8.** Complainant hesitated at the lineup in her identification of appellant because she realized he no longer had facial hair (moustache). She requested that the lineup participants speak, and she then said she was positive of her identification of appellant as her attacker.

48 (1975).[9] As to the count of assault with intent to rape, however, we view the evidence in the light most favorable to the government and conclude that the issue of consent, vel non, was for the jury. *Arnold v. United States,* D.C.App., 358 A.2d 335, 341 (1976) (en banc); *Johnson v. United States,* 138 U.S.App.D.C. 174, 426 F.2d 651 (1970).

There was a full presentation by prosecution and defense with active participation by the trial judge of their respective views as to the applicable test for determining consent or lack thereof. The purpose of the discussion was to decide to what degree, if any, subjective analysis should bear on the issue of consent. The question was of concern because of the complaining witness' alleged extreme passivity of personality, and because the trial court felt the case was close on the issue of consent.

■ The applicable test, as generally articulated in this jurisdiction, is that:

[C]onsent is not shown when the evidence discloses resistance is overcome by threats which put the woman in fear of death or grave bodily harm, or by these combined with some degree of physical force. . . . [*Ewing v. United States,* 77 U.S.App.D.C. 14, 16, 135 F.2d 633, 635 (1942), *cert. denied,* 318 U.S. 776, 63 S.Ct. 829, 87 L.Ed. 1145 (1943), cited with approval in *Arnold v. United States, supra* at 340, and *Johnson v. United States, supra* at 177, 426 F.2d at 654.]

Chief Judge E. Barrett Prettyman discussed the test in his Memorandum on Petition for Rehearing En Banc in *Farrar v. United States,* 107 U.S.App.D.C. 204, 275 F.2d 868 (1959), *rehearing en banc denied* (1960). He said:

As I understand the law of rape, if no force is used and the girl in fact acquiesces, the acquiescence may nevertheless be deemed to be non-consent if it is induced by fear; but the fear, to be sufficient for this purpose, must be based upon something of substance; and furthermore the fear must be of death or severe bodily harm. A girl cannot simply say, "I was scared," and thus transform an apparent consent into a legal non-consent which makes the man's act a capital offense. She must have a reasonable apprehension, as I understand the law, of something real; her fear must be not fanciful but substantial. [*Id.* at 212, 275 F.2d at 875; (footnotes omitted).]

In this case, the victim was struck in the eye, grabbed by the hair, and dragged some twenty-five feet into a darkened area of a muddy, deserted playground late on a winter night. She was warned to be quiet and had the assailant's hand over her mouth from time to time. She reported the incident to authorities immediately. These factors certainly militate toward a finding that complainant did not acquiesce to sexual relations but succumbed in the face of an assault and battery,[10] and the evidence was sufficient to put the case to the jury without resorting to any subjective aspects of complainant's fears due to mental capacity, personality or demeanor. Her fears were sufficiently reasonable under the circumstances to negate a directed verdict of acquittal on the basis of consent.

9. The context of the *Buck* case was prosecution for sodomy for acts performed by mutually consenting adult males in a secluded part of a public park at night. This court, per Reilly, C. J., held that the statute defining sodomy could be applied to activity to which there is mutual consent and that its application was not limited to forcible acts of sodomy.

10. The only direct testimony at trial concerning complainant's state of mind was the following taken on direct examination:

Q. Why did you go along with doing what he wanted you to do?
A. Because I was scared, and I thought he would probably hurt me.
    \*    \*    \*    \*    \*    \*
Q. Up to that point, had he hurt you in any way?
A. No.
Q. At any time during this thing, did you want him to do any of those things to you that he did?
A. No.

The judgments of conviction on appeal are

*Affirmed.*