**UNITED STATES of America**
v.
**Haywood SANDERS, Appellant.**
**No. 72–1534.**

United States Court of Appeals,
District of Columbia Circuit.

Argued March 14, 1973.

Decided May 17, 1973.

1. Section 8–3:606(a) provides:

Robb, Circuit Judge, dissented and filed opinion.

George F. Bason, Jr., Washington, D. C. (appointed by this Court), for appellant.

William A. White, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry, Vincent R. Alto and Warren L. Miller, Asst. U. S. Attys., were on the brief for appellee.

Before FAHY, Senior Circuit Judge, and LEVENTHAL and ROBB, Circuit Judges.

FAHY, Senior Circuit Judge:

A man entered a Hot Shoppe in this City around midnight on June 5, 1970, and inquired of the cashier, Miss Samu-

els, aged eighteen at the time, when the restaurant closed. She answered that they were closing. The man then went to the food counter and gave Mr. Johnson, the manager, a note which read: "This is a holdup; I have a gun under this coat [draped over his right arm] ; I don't want to hurt anybody." Under this threat the two men went into the manager's office. There, money was taken from the safe and that in the cash register was also required to be given him.[1] In all approximately $500.00 was put in a paper bag the robber had. He then fled with the bag.

Appellant was convicted of the robbery, 22 D.C.Code § 2901 (Supp. V, 1972), and is serving a sentence of two to seven years. His appeal questions the admission at trial of the identifications by Miss Samuels and Mr. Johnson, without whose testimony he could not have been convicted. The jury's own uncertainty as to the reliability of their identifications is indicated by what appears to have been a compromise verdict: convicted of robbery, appellant was acquitted of both armed robbery and assault with a dangerous weapon though there was no dispute a gun was used in the robbery. It is also significant that the judge who conducted the pretrial hearing on appellant's motion to suppress the identification testimony, although denying the motion, expressed concern about the identification by Miss Samuels.

We find in the totality of the circumstances that there was "a very substantial likelihood of irreparable misidentification," Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L. Ed.2d 1247 (1968), by Miss Samuels and Mr. Johnson, due to suggestive identification procedures, considered with the discrepancies and uncertainties in their testimony. We accordingly hold that their in-court identifications were inadmissible at this trial, requiring reversal. In developing the subject we refer first to the descriptions of the robber given by

---

1. Mr. Johnson sent another employee to get this money. This employee did not testify at trial because he could not be found.

Miss Samuels and Mr. Johnson to the police shortly after the robbery. We then address the photographic and line-up identifications by these witnesses, after which we outline their trial testimony. We then draw our conclusions.

### THE INITIAL DESCRIPTIONS

Miss Samuels testified at the suppression hearing that she had an opportunity to view the robber twice. The first was at the register when he asked if the restaurant was closed. The lighting there was "not very good"—because of the "orange lights." The second was after the robber went into the manager's office. When Miss Samuels came over to the doorway of the office Mr. Johnson told her to return to the cash register. The robber looked around and for a moment she saw him again. At the suppression hearing she testified as follows with regard to her initial description to the police, on her examination by defense counsel:

Q Did you give a description of the robber to the police?

A Yes, I did.

Q Do you recall how you described him?

A No, I don't.

Q Well did you describe any of the characteristics about the appearance of the robber, do you recall?

A He was stout.

Q He was stout?

A Yes.

\*    \*    \*    \*    \*    \*

Q Can you recall at this time whether or not the robber had a beard or a goatee?

A No—I cannot.

Q You cannot recall anything else unusual about his appearance other than that he was stout?

A He had a jacket, he had a dark jacket over his arm.

Q Other than his clothing there was nothing else about his appearance?

A No.

THE COURT: Are you saying that that is all you can recall, or that is all that you saw that night?

THE WITNESS: That is all I can recall.

THE COURT: That is all you can recall now?

THE WITNESS: Yes, sir.

BY [Defense Counsel]

Q Was there ever a time that you ever recalled any more?

A I'd say—I think I described him. Whether he had a lot of hair or anything—

Q You think what?

A Well I told them that he had hair and that, but I don't know—

THE COURT: He had hair?

THE WITNESS: He had hair on his face.

BY [Defense Counsel]

Q Are you saying that at one time you had told the police that he had some sort of facial hair?

A Yes, I think so.

Q Is that something that stuck out in your mind at the time?

A Yes.

Thus her description was uncertain and vague: stout man with some sort of facial hair and a dark jacket over his arm. During the redirect examination the Court asked if she would have been able to recognize the robber if she saw him on the street later on the day of the robbery. She replied, "No."

At the same hearing Mr. Johnson's initial description, which, as he put it, was "not very positive," was as follows:

Well, as best I can recall, I think I said he was about five foot six or seven, heavy structure, you know, around the neck line, and I think it was a slight beard  .  .  .  .

He had the better opportunity to observe the man during the robbery, which he said lasted "more or less  .  .  .

for about ten minutes—indirectly for about ten minutes." [2]

The initial description of the robber recorded by the police, without an indication which witness gave it, was more reflective of Mr. Johnson's recollection:

> Negro male—about 25, five feet six inches, tall, about 175 pounds, bush hair, dark complected . . . . [3]

## THE PHOTOGRAPHIC AND LINEUP IDENTIFICATIONS

On June 5, 1970, the day of the robbery, eight photographs of the head and shoulders of black males were shown to Miss Samuels and Mr. Johnson. The photographs gave no indication of height. Only two of the eight had any facial hair. One had a mustache, very short sideburns, and a slight goatee; he was not dark in complexion. The other had a heavy mustache, and sideburns down to his goatee or beard, which was full; he was also definitely dark in complexion, and heavier in build than the others. This was a photograph of appellant.

When shown the eight photographs, Miss Samuels testified that the detective told her "that one of these men might be the robber and if I looked through them and see if I could see the man there." She picked out the photograph of appellant. The following at the hands of the court occurred:

> THE COURT: . . . I'm asking you about the photographs—what was it that caused you to recognize this defendant. You did testify that if you had seen him in person in the street you wouldn't have recognized him, so what was it about the picture that caused you to recognize him?
>
> THE WITNESS: I don't know.

Six days later, on June 11, 1970, she attended a lineup of nine men. Appellant was the only man in the lineup whose picture had been shown to the witness. He was the tallest man, and the only heavy-set, stout person, who had a full mustache and full goatee. Miss Samuels identified him because "he was tall and stout and the man just looked like the man that robbed us and that is the best that I can do." Contrary to the initial descriptions of the robber as five feet six or seven inches, appellant was over six feet tall.

At the suppression hearing she admitted being better able to identify appellant because of the identification procedures:

> Q Did you say that since you had seen these photographs several times and you had been to the lineup, that now you are more familiar with what he looks like?
>
> A Yes.

Mr. Johnson was also shown the eight photographs on June 5, 1970. The investigating officer testified he told Mr. Johnson that among the eight was the photograph of a man an informer had named as the robber. After going through the photographs twice Mr. Johnson selected appellant's and explained why as follows:

> I told the Officer . . . that to the best of my knowledge that was it —looked like the guy that robbed me.
>
> Q Was there anything about this particular photograph that made you think it looked like the robber?
>
> A Yes—the area around the neckline and the shoulder area.
>
> Q Nothing to do with any facial hair?
>
> A Well, there was a chin beard, slight [apparently referring to his recollection of the robber] but I think this one was heavier [apparently referring to the picture], which would

**2.** Counsel for the appellant justifiably questions the accuracy of this "ten minutes," even as the witness qualified it, pointing out that Miss Samuels consistently testified that the robber entered the Hot Shoppe at 12:10 a. m., and Mr.

Johnson said that the robber left at about 12:15 a. m., "if I'm not mistaken."

**3.** Also included was a description of the robber's clothing, consistent with Mr. Johnson's recollection.

have made it more—I don't think this was why I was doubtful because the photograph didn't look one hundred percent like the guy. . . . [4]

At the lineup, Mr. Johnson also identified appellant as the man who looked more like the robber than anyone else in the lineup, again because of appellant's shoulders and neck. When asked at the suppression hearing if he could identify the robber if he met him on the street now, Mr. Johnson said he was uncertain.

## THE IDENTIFICATIONS AT TRIAL

At trial Miss Samuels described the robber as "stout, short bush, brown-skinned, goatee," and that he was wearing a green sweater. On cross examination she now said she would have been able to recognize the robber on the street if she saw him on the day of the trial and on the day or day after the robbery, in the latter respect contradicting her testimony at the suppression hearing a year earlier. She could not explain why she answered differently at trial.

Mr. Johnson described the robber as tall, close to six feet, although originally he had described him as being five feet six or seven inches. In identifying the photograph on June 5, 1970, he stated he could not be positive the man in the photograph was the robber. Similarly with respect to the lineup, Mr. Johnson said he was not positive, "not one hundred percent sure," meaning:

. . . if I am to determine whether or not someone has done a thing and solely on my determination, well I want to be sure, that I felt relatively sure if that was the man. But I wanted to erase any possibility that I could have been wrong. I saw the man and he appeared to be the same.

## CONCLUSIONS

The initial photographic identification procedures were impermissibly sugges-

tive. Among the eight partial photographs appellant's was the only one whose facial hair was in any way comparable to the initial uncertain descriptions given by the witnesses. Yet had the photographs been full length he would have been significantly taller than the witnesses had described the robber. The statement made by the investigating officer to Mr. Johnson as he viewed these photographs is admitted by the Government to have been suggestive, though the Government minimizes its effect. The suggestiveness of the statement to Mr. Johnson cannot be dismissed as of minimal effect but must be taken in its likely substantial impact, one which is magnified by the circumstance that Miss Samuels was such a weak identification witness. We have examined the photographs shown to the witnesses, and the photographs of the lineup. The stark fact is that appellant fairly leaps out of the pictures as the one person who is different, a judgment that can be made even without knowledge of what the witnesses said, because of his bulk and hair. When there is added to the equation the fact that these are distinctive characteristics attributed to the robber by Mr. Johnson, and that he was the one man whose photograph had previously been shown to both witnesses, it was well-nigh inevitable that he would be chosen in the circumstances. Foster v. California, 394 U.S. 440, 443, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969): Simmons v. United States, *supra*, 390 U.S. at 383–384, 88 S.Ct. 967.

The elements of suggestiveness must be considered in the totality of the circumstances. Miss Samuels saw the robber briefly, once under not very good lighting, and then momentarily under better lighting. Her initial description was quite vague as given at the time of the suppression hearing. She had admitted her inability to recognize the robber if she saw him on the street the

---

4. Mr. Johnson's testimony before the Grand Jury in August, 1970, was to be as follows: "I saw several [photographs], I don't know how many—but the one I would think to be more likely to be the one is the one that I picked out . . . . "

day of the robbery, yet she had become specific, with new details, at trial. As she said, having seen the photographs several times and him at the lineup she knew what he looked like.

Mr. Johnson, who had a better opportunity to observe the robber, thought originally he was about five feet six, whereas appellant was more than six feet tall. He also thought he had a slight beard. In the pictures appellant had a full beard. Mr. Johnson was never positive appellant was the robber. He chose him because his shoulders and neck were heavy-set rather than for any other particular reason.

Several factual elements enumerated by the Supreme Court as indicative of misidentification are clearly present: (1) vagueness and uncertainty in the original descriptions given by the witnesses to the police; (2) discrepancies between those descriptions and his actual appearance; (3) showing pictures of several persons among whom the photograph of a single such individual recurs or is in some way emphasized; (4) uncertainty in the pretrial identifications; (5) the "heightened chance of misidentification" if the police indicate to the witness that they had other evidence that one of the persons to be viewed committed the crime; and (6) the identification by picture of the defendant prior to the lineup. Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); United States v. Simmons, *supra*, 390 U.S. at 383, 88 S. Ct. 967; United States v. Wade, 388 U. S. 218, 241, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

In the totality of the circumstances we are of the opinion that the suggestive confrontations of the witnesses with the photographs and lineup gave rise to a very substantial likelihood of irreparable misidentification, rendering their in-trial identifications inadmissible as in violation of due process of law under the standards stated in United States v. Simmons, *supra*, 390 U.S. at 383–384,

88 S.Ct. 967; and see, United States v. Wade, *supra*, 388 U.S. at 241, 87 S.Ct. 1926; Foster v. California, *supra*, 394 U. S. at 442–443, 89 S.Ct. 1127; Neil v. Biggers, *supra*, at 198. Moreover, as appears from our analysis, the testimony lacks a solid basis for attributing the identifications to sources independent of the procedures referred to, and the errors residing in those procedures were not harmless, since the afflicted testimony was essential to the conviction. It is for these reasons we reverse.

In the event of a new trial, identifying evidence by the witnesses Samuels and Johnson would be admissible only upon clear and convincing evidence adduced by the government that their respective in-court identifications would rest upon a source independent of the identifying procedures we have held to have been impermissibly suggestive. United States v. Ash (en banc), 149 U. S.App.D.C. 1, 14–15, 461 F.2d 92, 105–106, cert. granted, 407 U.S. 909, 92 S.Ct. 2436, 32 L.Ed.2d 682 (1972); Mason v. United States, 134 U.S.App.D.C. 280, at 286, 414 F.2d 1176, at 1182 (1969). Cf. Foster v. California, *supra*.

The criteria governing the issue of admissibility which we have applied to the trial of this case was first referred to in Stovall v. Denno, 388 U.S. 293, 301–302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). The Court was there concerned primarily with the possibly retroactive application of *Wade,* involving the right to counsel under the Sixth Amendment, but the Court considered also whether the identifying procedures in *Stovall* constituted a deprivation of due process of law under the Fifth Amendment, our present problem. And see, Foster v. California, *supra*, 394 U.S. at 442–443, 89 S.Ct. 1127; Simmons v. United States, *supra*, 390 U.S. at 383–384, 88 S. Ct. 967; and see generally, Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230 (1968), cert. denied, 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969).

Reversed and remanded.

ROBB, Circuit Judge (dissenting):

I cannot agree that the circumstances shown by the evidence compel the conclusion that there was "a very substantial likelihood of irreparable misidentification".

The district judge who denied the motion to suppress found "that the manner in which the photographs were shown and in which the lineup was held are not so impermissibly suggestive as to deprive this defendant of due process." (Motion to Suppress TR. 40). He concluded "that the evidence is a matter to be considered on the issue of credibility rather than on the question of admissibility." (Motion to Suppress TR. 40). I agree, and would therefore affirm the conviction.

Without laboring my view of the evidence summarized by the majority I mention certain considerations and circumstances which the majority overlooks or does not emphasize:

1. Miss Samuels testified that she confronted the defendant face to face on two occasions, once when he came up to her at the cash register and again by the manager's office. On each occasion he was only three or four feet away from her. The lighting by the cash register "was bright enough so you can see anybody in the building" and by the manager's office there was "a real bright light." (Trial TR. 87). Furthermore, she testified at the suppression hearing that she thought she had seen the defendant before, as a customer in the Hot Shoppe. (Motion to Suppress TR. 25).

2. The majority says that the district judge, although denying the motion to suppress, "expressed concern about the identification of Miss Samuels". The concern expressed by the District Judge was about the response of Miss Samuels to the hypothetical question, whether she could have identified the defendant if she had seen him on the street on the day after the robbery. (Motion to Suppress TR. 37). I give little weight to such a hypothetical question and speculative answer. Otherwise Miss Samuels was at all times positive in her identification. (Grand Jury TR. 7, 9–10; Motion to Suppress TR. 13, 23; Trial TR. 84, 85).

3. The majority attaches great weight to the original descriptions of the robber given by Miss Samuels and Mr. Johnson, which descriptions are characterized as uncertain, vague and not very positive. Except for the item of height, however, these descriptions are not inconsistent with the defendant's appearance. In any event a witness may retain a mental image of a man, but be unable to describe him precisely. As Miss Samuels testified, explaining why she identified the defendant in the lineup, "the man just looked like the man that robbed us and that is the best that I can do." We should recognize also that at best the descriptions given by victims of crime are apt to be inaccurate; ordinarily a man confronted with a pistol does not think about the Bertillon measurements of his assailant. Thus Mr. Johnson told the grand jury "I could probably look at the gun and identify it better than I could the man." (Grand Jury TR. 30).

The issue of the defendant's identification was presented and argued to the jury under proper instructions. I would not retry the issue here, but would affirm the verdict and sentence.