**STATE of North Dakota, Plaintiff and Appellee,**

v.

**Timothy Roger LEWIS, Defendant and Appellant.**

**Cr. No. 702–B.**

Supreme Court of North Dakota.

Dec. 19, 1980.

Thomas M. Tuntland, State's Atty., and James Johnson, Asst. State's Atty., Mandan, for plaintiff and appellee State of North Dakota.

Charles R. Isakson, Hazen, for defendant and appellant.

VANDE WALLE, Justice.

Timothy Roger Lewis appeals from a judgment of conviction following a trial by jury in the district court of Morton County. Lewis was convicted of robbery under N.D. C.C. Section 12.1–22–01(2), a Class B felony. We affirm.

On October 17, 1978, Donna Ennen, a restaurant employee, while sitting in her car in the restaurant parking lot counting her tip money, was robbed of that money. Three other employees, while leaving the restaurant, witnessed the robbery. These three witnesses testified that as they exited the east door and began walking into the parking lot they saw the defendant, as he was about halfway across the parking lot, running in a northerly direction toward Mrs. Ennen's car. The witnesses also testified that they observed the defendant lean into Mrs. Ennen's vehicle for a few moments, run back across the parking lot in a southerly direction, and enter a late-model brown and black Ford. The testimony revealed that these witnesses were standing 63 to 65 feet from Mrs. Ennen's car while they observed these activities.

Mrs. Ennen testified that as she was sitting in her car counting her money the car door was opened and she felt something being thrust into her ribs; that she looked up and saw the defendant, who asked if she had money and she handed him $12. He then asked if she had any more and she responded in the negative. She further testified that the defendant moved his face close to hers and said: "Kiss me like you love me and don't say anything," and that following this, the defendant left the scene in the Ford.

Soon after the incident, the victim and all three witnesses gave to the police general descriptions of the person they saw commit the robbery. Their descriptions were generally that the robber had been a medium-to-tall, slim black man with a beard and wearing dark clothing. All four stated that he had left the scene in the brown and black Ford, and one witness gave a partial license-plate number on the vehicle.

Later in the evening, after a description of the robber and the car he had fled in had been broadcast to members of the Mandan police department, Lieutenant Moldenhauer of the Mandan police department observed two black men walk from the direction of a vehicle which fit the witnesses' description toward and into a liquor store. Soon afterward, the defendant and a companion came out of the liquor store at which time Lieutenant Moldenhauer asked them for identification. The two men gave Moldenhauer some identification, and after one of the detectives investigating the robbery had arrived at the scene and talked with the two men, both men were taken to police headquarters where they were photographed and placed in custody.

On the same evening, Detective Anderson and Detective Bullinger of the Mandan police department, along with Special Agent Lennick of the Bureau of Criminal Investigation, assembled a photographic display to be shown to the victim and the three witnesses. The display consisted of seven colored photographs of black men. One of the photographs was of the defendant, one was of his companion at the time of his apprehension, and five were obtained from the Bismarck police department. Of the five

obtained from the Bismarck police department, two were of the same subject.

Later that evening, Mrs. Ennen, the victim, and Mrs. Sayler, one of the three witnesses, were separately shown the photographic display at the Mandan police department. Mrs. Ennen picked the photograph of the defendant as the image of the man who robbed her. Mrs. Sayler was unable to state that any of the photographs depicted the man she saw in the parking lot earlier that day.

The following day, October 18, 1978, Mrs. Eckroth and Mrs. Ebel, the other two witnesses, were separately shown the photographic display. Mrs. Ebel, like the victim, identified the defendant. Mrs. Eckroth, like Mrs. Sayler, was not able to make an identification from the photographs.

Following the denial of a motion to suppress the pretrial and trial identification of the defendant by the witnesses, Lewis was tried and convicted.

Lewis raises two issues on this appeal:

1. Whether or not the photographic-display identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification and, if so, whether or not any subsequent identification of the defendant had a basis independent therefrom which made the identification admissible at trial.

2. Whether or not the photographic display was a critical stage in the prosecution entitling the defendant to representation by counsel during such display.

## I

The United States Supreme Court has addressed the issue of initial identification of a defendant by photograph and has established a standard by which this procedure could be measured in an effort to determine whether or not this method of identification has been "so unduly prejudicial as to fatally taint his conviction." *Simmons v. United States*, 390 U.S. 377, 383, 88 S.Ct. 967, 970, 19 L.Ed.2d 1247, 1252 (1968). The Court in *Simmons* first observed that, although there are hazards regarding this method of identification, the procedure is widely and effectively used for apprehending guilty persons while simultaneously sparing innocent persons from damage to their reputations by unnecessary arrest. 390 U.S. at 384, 88 S.Ct. at 971, 19 L.Ed.2d at 1253. The Supreme Court further observed that the possibility that this method may result in convictions based on misidentification is tempered by the fact that cross-examination at trial is available to the defendant to expose any inadequacies he believes existed in the procedure.

The standard spelled out by the Supreme Court to test the prejudicial potential of pretrial photo-identification is:

" . . . that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id.*

Furthermore, this court has held that where a victim has had a chance to closely observe the defendant during the commission of the offense, has given a description to the police which fits the defendant, and has identified the defendant shortly after the crime, this may be sufficient to show that the victim's in-court identification of the defendant was not based on the pretrial viewing of him, but had a basis independent of that viewing. *State v. McKay*, 234 N.W.2d 853 (N.D.1975).

We first address the question of whether or not the photo-identification procedure at issue here passes the *Simmons* test.

In *Simmons v. United States, supra,* the case setting forth the standard under which we determine the adequacy of the photographic-display procedure used here, the Court spelled out several considerations regarding the totality of circumstances which we should review in arriving at our determination. 390 U.S. at 383, 88 S.Ct. at 971, 19 L.Ed.2d at 1253.

The first consideration deals with whether or not there was substantial vagueness and uncertainty in the original descriptions given by the witnesses to the police. In this case, the victim and the three witnesses gave generally the same descriptions of the man who committed the robbery. All claimed that he was a tall, slim black man with a full beard and wearing dark clothing. The victim and two of the witnesses gave the same description of the car in which the robber fled. While not containing vivid detail, these initial descriptions were not vague and uncertain. This court has determined that it is not necessary for a witness to give an exact, detailed description of an offender for identification purposes. *State v. McKay, supra.*

Another consideration is whether or not there exist substantial discrepancies between the initial description and the actual appearance of the defendant. This question is easily answered by the defendant's own contention that he was the only person portrayed in the photographic display who fit the general description given by the witnesses. Whether or not his contention is significant is discussed below; however, that contention does serve to point out that Lewis does not raise discrepancies between initial description and actual appearance as an issue.

A third point of consideration is whether or not, in a showing of photographs to the witnesses, the photograph of the defendant was used more than once or was in some way emphasized. This factor lies at the core of Lewis's contention that the display in this case was impermissibly suggestive. Lewis anchors his argument in *United States v. Sanders*, 479 F.2d 1193 (D.C.Cir. 1973). Lewis dwells on the fact that the photograph of the defendant in *Sanders* was one of only two among eight photographs which portrayed a man with facial hair and that the defendant's beard in that case looked much more like the one initially described by the witnesses earlier. He suggests that on this basis alone the conviction of the defendant in *Sanders* was overturned. He reasons that because his was the only photograph appearing in the photographic display at issue here which portrayed a person with facial hair but wearing no glasses, his conviction should likewise be reversed. However, it would appear that Lewis is misinterpreting the "totality of circumstances" standard as one which could be labeled the "totality of the photographs" standard. A review of the holding in *Sanders* discloses that the images in the photographic display in that case showed the defendant as the only person who had a complexion, body build, and facial hair which were in any way comparable to the initial uncertain descriptions given by the witnesses. Further, the dissimilarity between the images in the photographic display in *Sanders* was only one of the circumstances taken into account by the Court. The Court considered the very vague general descriptions that the two witnesses were initially able to give to the police. The Court also considered the fact that one of the witnesses was told, while viewing the photographic display, that one of the photographs was of a man who an informant had told the police had committed the crime. In addition, the Court considered the fact that one of the witnesses, subsequent to the photographic display, had attended a lineup in which the defendant was the only man present whose photograph had been shown to the witness. Further, in the lineup the defendant was the tallest man and the only stout person who had a full mustache and a full goatee. One witness in *Sanders*, during testimony at a suppression hearing, said she would not have been able to recognize the robber if she saw him on the street later on the day of the robbery. This same witness testified at the trial with more specificity regarding the robber's description and claimed that she would have been able to identify the robbery if she had met him later on the day of the robbery. The other witness testified at the suppression hearing that he was uncertain as to whether or not he could later identify the robber if he met him on the street. It was this totality of circumstances on which the Court in *Sanders* based the overturning of the conviction,

rather than solely on the images in the photographic display.[1]

In the present case, the display at issue was composed of seven photographs of black men. Two of the photographs, although not identical, were of the same man; however, those photographs were not of the defendant. All the photographs were of men who appeared to be generally within the same age range. All the photographs were frontal views of the subjects from approximately the lower chest area to just above the head. All the photographs were the same size and of the same general quality. All the subjects appeared to have approximately the same upper body builds and head sizes. With the exception of one photograph, which was not of the defendant but had four numerals printed in the upper righthand corner, there were no identifying markings such as names, dates, or law-enforcement agencies appearing on any of the photographs.

Lewis stresses that he was the only person portrayed in the display of seven photographs who had a beard and was not wearing eyeglasses. He argues that this made his the only photograph portraying a person who completely matched the general description initially given by the victim and witnesses and, as such, amounted to a highly suggestive "flag" among the group of photographs. We would point out, however, that while the victim and all three witnesses gave the same general description of the robber, only the victim and one of the witnesses made positive identification of the defendant from among the photographs. This does much to weaken Lewis's contention that the photographic display was so suggestive as to leave the victim and witnesses with no choice but to select him from among those portrayed in the display.

■ Lewis takes particular exception to the police request that he remove his eyeglasses before being photographed. He claims that he wears his eyeglasses on all occasions and that had he been wearing his eyeglasses in the photograph the witnesses' attention might have been directed away from his photograph. However, we find nothing unreasonable concerning the request by the police that Lewis remove his glasses. It is not unusual for police to request of subjects to be photographed that they put on or take off certain items. This is a practice that is employed so that the subjects, as they appear in the photographs will more closely resemble the appearance of the offender as originally described by the witnesses and based on their perception at the time of the offense. We do not view this practice as impermissibly suggestive standing alone. Rather, we see its employment in a particular photographic display procedure as only one element to be considered in a totality of circumstances. So far as this particular case is concerned, one of the photographs appearing in the display at issue did portray a subject who was wearing eyeglasses. However, the presence of that photograph is more easily understood when one considers the difficulty with which law-enforcement officers are faced when they find it necessary to assemble a group of photographs of similar-looking black males in a part of the country where relatively few such individuals reside. In the present case, the investigating officers had no photographs other than those of Lewis and his companion which could be used for the photographic display. In their efforts to assemble the display, the officers made a trip to Bismarck and enlisted the assistance of the Bismarck police department and the State Crime Bureau. There is little doubt that the officers, had they utilized law-enforcement resources of other North Dakota cities, could have obtained other photographs. However, the time nec-

---

1. To supplement his *United States v. Sanders, supra,* argument, Lewis relies on *People v. Simon,* 370 N.Y.S.2d 79, 49 A.D.2d 517 (1975). That case resulted in a finding that the photographic display at issue was impermissibly suggestive, primarily because of dissimilarities between the defendant's photograph and others in the display. However, even a cursory review reveals the dissimilarities between the photograph of the defendant in *Simon* and those of the others in the display were so much greater than any dissimilarities which may have been present in this case that we need consider that decision no further.

essary to conduct such an extended search raises the possibility that witnesses' memories may fade, thus jeopardizing accurate identifications. The time necessary for a broadened search might force unnecessary detainment of a suspect or, conversely, enable a guilty person, not being held, to leave the State. While these possibilities, standing alone, are not controlling, we believe that under the circumstances of this case reasonable efforts were made by the investigating officers to assemble a fair photographic display.

A fourth consideration, based upon the guidelines set forth in *Simmons v. United States, supra,* is whether or not there was significant uncertainty in the identification of the defendant by the witnesses at the pretrial photographic display. A review of the record indicates that neither witness Eckroth nor witness Sayler was able to accurately identify Lewis in the photographic display as the man seen robbing the victim. However, the victim and witness Ebel were able to positively identify Lewis in the display in approximately one minute. This, we believe, reflects deliberate scrutiny of all seven photographs and in no way indicates either that the photographic image of Lewis leaped out at the viewers or that the viewers took so much time to make an identification as to raise serious questions regarding their certainty.

Another consideration in applying the "totality of circumstances" standard to the photographic display in question here is whether or not the police heightened the chances of misidentification by indicating to the viewers that they had evidence that one of the persons portrayed in the photographic display committed the crime. Lewis contends that the victim, Donna Ennen, testified at the suppression hearing that she had been told by the police at the time she viewed the photographs that a suspect was in custody. However, a review of her testimony reveals that this information was disclosed to her *after* she identified the defendant from among those portrayed in the display. There is no evidence in the record indicating that the police revealed to the victim nor to any of the witnesses that evidence existed which linked a subject of the display to the crime.

We consider also the time span between the commission of the crime and the time the victim and witnesses viewed the photographs. Donna Ennen, the victim, and Irene Eckroth, one of the witnesses, viewed the photographic display within several hours after the robbery occurred. Witnesses Ebel and Sayler were shown the photographs the morning following the incident. All four women viewed the photographs separately. We believe that there is nothing about the time lapse between the incident and the viewing of the display which suggests that the women's recollections would have been impaired to the point where they would have identified only a subject who looked somewhat like the person they saw.

■ Our review of the totality of circumstances surrounding the photographic display procedure at issue here leads us to conclude that the display was not so impermissibly suggestive as to require reversal of the defendant's conviction. In light of this conclusion, it is not necessary for us to apply the test enunciated in *McKay, supra,* to determine whether or not the in-court identification of the defendant was supported by a basis independent of the photographic display.

## II

The second issue Lewis raises on this appeal is whether or not the photographic display was a critical stage in his prosecution entitling him to representation by counsel at the display. At all times during the photographic display at issue here, Lewis was in custody but had not been charged.

■ Lewis did not raise this question at trial and the State now claims that because Lewis failed to raise the issue below, he is precluded from raising it on this appeal. However, this court, pursuant to Rule 52(b),

N.D.R.Crim.P.,[2] may consider an issue not brought to the attention of the trial court when that issue bears upon a substantial right of the defendant. There can be no question that a defendant's right to counsel is a substantial right and we accordingly consider the issue.

The question of when, during the pretrial stages, a criminal defendant's right to counsel attaches has a complex history of litigation,[3] much of it relatively recent. We do not find it necessary to embark on an extensive historical review of the cases addressing this topic. However, a brief outline of the major cases will help to clarify our position on the particular issue at hand.

In *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), the United States Supreme Court held that a post-indictment lineup at which a defendant is shown to witnesses is a critical stage of the criminal prosecution; that when such a lineup is conducted without notice to and in absence of counsel for the defendant he has been denied his Sixth and Fourteenth Amendment right to counsel; and the admissibility of the in-court identification of the defendant by the witnesses is thus called into question. These two cases further held that no in-court identifications are admissible in evidence if they are based on such unconstitutional lineups.

In *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), a plurality of the Court concluded that the right to counsel, as discussed in *Wade, supra*, arose only at or after adversary judicial proceedings had been initiated. The Court, citing its major cases dealing with the right to counsel, pointed out:

"While members of the Court have differed as to existence of the right to counsel in a context of some of the above cases, *all* of those cases have involved points in time at or after initiation of adversary judicial criminal proceedings— whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." [Emphasis in original.] 406 U.S. at 689, 92 S.Ct. at 1882, 32 L.Ed.2d at 417.

The Court in *Kirby, supra*, refused to apply the *Wade* standard in a situation where the two defendants had been arrested and brought to a police station and the victim was brought into a room where the defendants were being held and the victim identified the suspects as the persons who had robbed him. The Court declined to:

"... import into a routine police investigation an absolute constitutional guarantee historically and rationally applicable only after the onset of prosecutorial proceedings." 406 U.S. at 690, 92 S.Ct. at 1882, 32 L.Ed.2d at 418.

The Court went on to point out that abuses in similar police investigatory practices are not beyond the reach of the Constitution because the Due Process Clause of the Fifth and Fourteenth Amendments forbids a lineup that is unnecessarily suggestive and conducive to irreparable mistaken identification. 406 U.S. at 691, 92 S.Ct. at 1183, 32 L.Ed.2d at 418.

In *United States v. Ash*, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973), the Supreme Court was faced with the issue of

---

**2.** Rule 52(b), N.D.R.Crim.P., reads:
  "(b) *Obvious Error.*
  "Obvious errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

**3.** Thus in *State v. Starratt*, 153 N.W.2d 311, 312 (N.D.1967), this court, in paragraph 5 of the syllabus, stated:
  "There is no arbitrary point in time at which the right to be represented by counsel, or, if indigent, the right to be represented by court-appointed counsel, attaches in pre-trial

proceedings. The critical point is to be determined both in the nature of the proceedings and from that which actually occurs in each case."
*Starratt*, which dealt with the right to counsel at a preliminary examination, preceded *Coleman v. Alabama*, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970), which held that the right is in force at that point. However, this quotation from *Starratt* remains a viable general standard regarding a defendant's right to counsel at pretrial proceedings.

whether or not a criminal defendant's right to counsel attached to a post-indictment photographic identification. The Court held that it did not. The Court distinguished *Wade, supra,* stressing the "trial-like confrontations" which that case represented. The Court pointed out that the focus is on the question of whether or not "the accused required aid in coping with legal problems or assistance in meeting his adversary." *Ash, supra,* 413 U.S. at 313, 93 S.Ct. at 2575, 37 L.Ed.2d at 628. This focus, of course, is derived from the Court's reasoning in *Wade, supra,* wherein it declared that a pretrial proceeding is a critical stage if "the presence of . . . counsel is necessary to preserve the defendant's . . . right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself." *Wade, supra,* 388 U.S. at 227, 87 S.Ct. at 1932, 18 L.Ed.2d at 1157.

The Court in *Ash, supra,* in making its determination relative to the right to counsel at photographic identifications, conducted a historical analysis of the right to counsel itself. The Court concluded that the right had originally surfaced to counterbalance any overreaching on the part of the prosecution at trial. The Court went on to recognize that changing patterns of criminal procedure in investigation had brought about pre-trial practices which were possibly, in terms of confrontation, as determinative as the trial itself, thus necessitating the expansion of the right to those events. The Court pointed out, regarding expansion of the right to counsel,

> "The test utilized by the Court has called for examination of the event in order to determine whether the accused required aid in coping with legal problems or assistance in meeting his adversary." *Ash, supra,* 413 U.S. at 313, 93 S.Ct. at 2575, 37 L.Ed.2d at 628.

We are familiar with the case of *People v. Anderson,* 389 Mich. 155, 205 N.W.2d 461 (1973), wherein the Supreme Court of Michigan, with heavy emphasis on the fact that pretrial identifications lack scientific accuracy and are at times impossible to recon-

struct at trial, held that a criminal defendant does have the right to counsel during a pretrial photographic display. But in *Ash, supra,* the United States Supreme Court pointed out:

> "Lack of scientific precision and inability to reconstruct an event are not the test for requiring counsel in the first instance. These are, instead, the tests to determine whether confrontation with counsel at trial can serve as a substitute for counsel at the pretrial confrontation. If accurate reconstruction is possible, the risks inherent in any confrontation still remain, but the opportunity to cure defects at trial causes the confrontation to cease to be 'critical.'" 413 U.S. at 316, 93 S.Ct. at 2577, 37 L.Ed.2d at 630.

We agree with the application of the historical analysis by the Court in *Ash, supra,* and believe that where a defendant is not present at the time of the photographic display, and asserts no right to be present, there can be no possibility that he might be misled by his lack of familiarity with the law or be overpowered by his professional adversary. *Ash, supra,* 413 U.S. at 317, 93 S.Ct. at 2577, 37 L.Ed.2d at 631.

■ For this court to extend the right to counsel to investigatory procedures such as the one involved here could open the doors to claims that this right reaches many levels of police investigation. As to the photographic display at issue here, we agree with the United States Supreme Court's statement in *Ash, supra,*

> "We are not persuaded that the risks inherent in the use of photographic displays are so pernicious that an extraordinary system of safeguards is required." 413 U.S. at 321, 93 S.Ct. at 2579, 37 L.Ed.2d at 633.

Police and prosecutorial integrity should be a primary safeguard against the potential hazards to a defendant's rights during a photographic display. If that responsibility of the State's law-enforcement officials is not upheld, the defendant will be protected under due-process guarantees. In the case before us, a thorough review of the record indicates that the police clearly engaged in

reasonable efforts to assemble a nonsuggestive photographic display and to present that display to the witnesses under conditions which in no way could be labeled a "trial-like confrontation."

The judgment of conviction is affirmed.

ERICKSTAD, C. J., and PAULSON, PEDERSON and SAND, JJ., concur.