BRENNAN, J.
¶1 Melvin Lidall Terry appeals from a judgment of conviction and an order denying his motion for a new trial.[1] Terry was convicted of three charges-first-degree reckless homicide, first-degree recklessly endangering safety, and felon in possession of a firearm-in connection with the shooting death of Naurice Elliott.
¶2 Terry argues that the trial court erred when it denied his pretrial motion to suppress testimony from a nearby neighbor who witnessed the shooting and who had, shortly afterward, picked Terry out of a group of three people sitting on a curb and identified him as the shooter. Terry argues that the identification should have been suppressed under the standard for out-of-court showup identifications that is set forth in State v. Dubose , 2005 WI 126, ¶33, 285 Wis. 2d 143, 699 N.W.2d 582. He argues in the alternative that the procedure used for the out-of-court identification was impermissibly suggestive and unreliable such that it violated his right to due process. We conclude that the Dubose showup standard is inapplicable here because unlike the showup addressed in Dubose that involved a witness presented with a single suspect, the out-of-court identification made here involved a witness presented with three suspects. We further conclude that Terry has not met his burden of showing that the procedure-an officer presenting the witness with three subjects sitting on a curb without telling the witness which one was the suspect-was impermissibly suggestive. It was therefore not a violation of Terry's right to due process.
¶3 Terry also argues that it was error for the postconviction court to deny his motion for a new trial without a hearing. He argues that he is entitled to an evidentiary hearing on his claim that trial counsel rendered constitutionally ineffective assistance by failing to present expert testimony on the reliability of eyewitness identification. We conclude that Terry has not shown that the presentation of research on eyewitness identification[2] would have created a reasonable probability of a different result, or that the failure to present such evidence undermines confidence in the outcome.[3] The record reflects that Elliot's best friend Thomas[4] had seen Terry before, had been with Elliot when he had contact with Terry during a drug deal earlier in the day, was with Elliot when both were confronted by Terry and realized Terry had a gun, and was attempting to drive away with Elliot in a car when Terry shot Elliot in the head. Thomas unequivocally identified Terry as the shooter.[5]
¶4 We therefore affirm.
BACKGROUND
¶5 Elliot's shooting death followed a fight over a drug deal that Elliot was upset about. Terry was with his then-girlfriend, Tiffany Carter, when she sold marijuana and cocaine to Elliot on June 18, 2013, at a gas station. Thomas was also present with Elliot. For reasons that are not clear from the record, Elliot later became angry about the drug purchase, and he wanted to confront Carter to get his money back. Thomas drove Elliot around the area looking for her. When they found her, she was walking alone. Elliot got out of the car, tried to get her to give him money, and hit her in the face, causing her nose and mouth to bleed. Thomas intervened to stop Elliot, and he and Elliot got back in the car. Thomas and Elliot watched Carter walk away, and then they saw Terry "peeking around the corner" from an alley. Elliot then directed Thomas to "go to the alley," and Thomas pulled into the alley, where they encountered Terry walking toward the car. As Terry got closer to the car, Elliot and Thomas noticed that Terry had a gun. Elliot told Terry to "pull off" and "get up out of here." They heard Terry say, "You hit my bitch, P." Thomas put the car in reverse for "a couple feet" and then put it in drive to pull forward out of the alley. As he pulled forward, he saw Terry shooting. Thomas drove out of the alley in panic, hit a pole, and then took Elliot, who had been shot in the head, to the hospital. Elliot did not survive the gunshot wound.
The eyewitness identifications and other evidence.
¶6 The police arrived on the scene quickly and, based on witness interviews, arrested Terry along with Carter and Carter's brother, X.C. The three were taken into custody as they walked out of a house near the alley.
Neighborhood resident C.K. and her sister, D.L.
¶7 The witness who pointed police to Terry and Carter was C.K.,[6] a nearby resident who was outside on her porch with her sister, saw a man chase a car into an alley, heard gunshots, and then saw three people-later identified as Terry, Carter, and X.C.-walking quickly into a house that was directly across the street from hers. As she was telling this to police, she saw the same three people come out of the house. She told police that one of the three was the man who chased the car into the alley.
¶8 C.K.'s sister D.L. told police that she also had heard the gunshot and had seen the man, the car, and the three people going into the house.
¶9 Police identified the three people and arrested them. As police continued talking to nearby witnesses, they had the three sit on a curb. The three were not handcuffed.
Neighborhood resident S.C.
¶10 While they were still on the scene, police spoke with S.C., a man who lived in a house just off of the alley where the shooting occurred. He told police he was returning home from work and parked his truck in the alley when he saw a man with a gun. He described the man as about six feet tall, with braided hair, wearing sunglasses, a white t-shirt with graphics on it, dark jeans, and a jean jacket with bleach stains. As he watched the man, he saw him point the gun "at someone down at the end of the alley," then saw him shoot the gun once.
¶11 In trial testimony, S.C. described what happened after he told the officer what he had seen. The officer asked him to "drive past some suspects that they had on the curb." S.C. walked past the three on the way to the squad car, passing less than two feet away from them. He testified that in the squad car he repeated what he had seen, and the detective then told him, "All right. I want you to look over and identify who it was."
Elliot's best friend Thomas
¶12 Thomas and Carter, who had witnessed the events leading up to and following the shooting, testified at trial and provided positive identification of Terry, though Carter testified that she did not see him fire the gun. Thomas testified that he did not know Terry and Carter well but that they were people he had seen before. He described the drug purchase, the confrontation with Carter, and the shooting in the alley, and he unequivocally identified Terry as the man who was with Carter at the gas station and as the man who confronted Elliot in the alley and then shot him.
Terry's girlfriend Tiffany Carter
¶13 Carter testified about having contact with Thomas at the gas station, then being followed by Thomas's red Cadillac, being confronted by Elliot, running away, and then, hiding in the bushes in the alley. From there, she testified, she could see Terry at the end of the alley. Carter, who at the State's request was declared an adverse witness, first testified that she ran past Terry and did not see Terry with a gun. She testified that once she was inside a nearby house, she heard gunshots. However, after the State impeached her testimony with prior deposition testimony, she testified that she had seen Terry with a gun in the alley, and she agreed that she had previously told a detective that she had been angry with Terry for shooting Elliot rather than fighting him. She denied seeing Terry fire the gun.
Two sisters attending a nearby party
¶14 Police also obtained statements from two sisters, A.F. and M.F., who were attending a graduation party in the alley. Each told police she saw a man with dreads or braids in a bleached jean jacket. A.F. saw a shiny object in the man's hand; M.F. saw a silver gun in his hand. They both heard when the gun was fired.
Results of the photo arrays
¶15 When photo arrays with Terry as the target were shown to S.C., C.K., and D.L. several months later, each appeared to focus attention on Terry's picture but none ultimately picked any photo from the array.
Results of the search of the house
¶16 A detective testified that a bleached jean jacket had been found on a bed during a search of the house that Terry and Carter had entered and exited just after the shooting.
The trial court's ruling on Terry's motion to suppress.
¶17 Terry moved to suppress the identifications made by C.K. and S.C. on the grounds that the procedures employed in obtaining them were unnecessarily suggestive. The trial court denied the motion after a hearing in which witnesses testified. As to C.K., it found that there was nothing impermissibly suggestive in the police interaction with her because police acted "in response to her initiation[.]" Although the trial court acknowledged that the failure to follow "well-established department procedure" with regard to the presentation of the suspects to S.C. created "a high risk" for misidentification, it also specifically found that "there is really a lack of evidence in this record that ... any law enforcement officer suggested to [S.C.] ... which person he should identify, if anybody, that was sitting on the curb." The trial court stated that "[t]here is no testimony that the detective told [S.C.] he believed that one of these three people was the shooter, simply that they were people who might be involved in the offense[.]" It further found that the witness's identification had "a lot of other indicia of reliability"-namely credibility, lack of motivation to lie, and the closeness in time to the event. It therefore concluded that "under the totality of the circumstances, their identifications were reliable."
The verdict and postconviction motion.
¶18 The jury convicted Terry on all counts. Terry moved for postconviction relief on the grounds of ineffective assistance of counsel based on counsel's failure to present an expert opinion on the reliability of eyewitness identifications. The trial court denied the motion for a new trial without a hearing.
¶19 First, the trial court concluded that the proffered expert opinion was "facially insufficient" to support a conclusion that trial counsel performed deficiently in light of the fact that the expert's report explicitly stated that he did "not have an opinion about the accuracy of the identifications in this case" and offered only "generalized criticisms" of the procedures used. The trial court found that the expert report's characterization of witness accounts was "unsupported by the facts presented at trial" and noted that the expert report "fail[ed] to address the other factors that lend credibility to the witness identifications[.]" It cited "the overarching consistency of the witnesses' statements, the clarity of their recollections, the short period of time between when the witnesses observed the events and identified the defendant, and the extraordinary amount of circumstantial evidence that supports the accuracy of their identifications[.]"
¶20 Second, the postconviction court concluded that Terry had not shown that he had been prejudiced by trial counsel's failure to present expert testimony "suggesting that [S.C.] and [C.K.] could not have accurately identified the defendant because they are white and the defendant is African American." The postconviction court concluded that "there is no reasonable probability that [such expert testimony] would have affected the outcome of the trial[ ] since [S.C.] and [C.K.] were only two of a number of individuals, including African Americans , to offer a similar description of the defendant and/or to identify him as the shooter."
DISCUSSION
I. The trial court did not err in denying the motion to suppress S.C.'s identification of Terry because the procedure employed was not unduly suggestive.
A. Standard of review and governing law.
¶21 In reviewing a motion to suppress, we apply a two-part standard of review. See State v. Eason , 2001 WI 98, ¶9, 245 Wis. 2d 206, 629 N.W.2d 625. We uphold a trial court's findings of historical fact unless they are clearly erroneous. See id. We review the application of constitutional principles to those facts de novo . See id. This case concerns solely the application of constitutional principles to the facts.
¶22 Impermissibly suggestive identification procedures that result in "the likelihood of misidentification" violate a defendant's right to due process. See Powell v. State , 86 Wis. 2d 51, 64, 271 N.W.2d 610 (1978) (quoting Neil v. Biggers , 409 U.S. 188, 198-99 (1972) ). A court reviewing the admissibility of an out-of-court identification employs a two-step analysis. Id. at 65. "First, the court must determine whether the identification procedure was impermissibly suggestive." Id. "Second, it must decide whether under the totality of the circumstances the out-of-court identification was reliable, despite the suggestiveness of the procedures." Id. If the court determines that the identification procedures were not unnecessarily suggestive, it need not continue the analysis of whether the identification was "otherwise reliable under the totality of the circumstances."See id. at 68.
¶23 The Wisconsin Supreme Court adopted standards for a particular type of out-of-court identification in Dubose , which addressed whether two "showups" were impermissibly suggestive. Id. , 285 Wis. 2d 143, ¶1.
¶24 Dubose contained the following footnote defining "showup" as a procedure involving a single suspect presented to a witness: "A 'showup' is an out-of-court pretrial identification procedure in which a suspect is presented singly to a witness for identification purposes." Id. , ¶1 n.1 (emphasis added) (citing State v. Wolverton , 193 Wis. 2d 234, 263 n.21, 533 N.W.2d 167 (1995) ). The court held that where evidence came from "such a showup," it was admissible only if the showup was "necessary":
We hold that evidence obtained from such a showup will not be admissible unless, based on the totality of the circumstances, the showup was necessary. A showup will not be necessary, however, unless the police lacked probable cause to make an arrest or, as a result of other exigent circumstances, could not have conducted a lineup or photo array.
Id. , ¶2. In Dubose , our supreme court held: (1) that the showups were unnecessary because probable cause existed to make the arrest; and (2) that the showups were unnecessarily suggestive. Id. , ¶36. It therefore held that the resulting identification should have been suppressed. Id. , ¶37.
B. The Dubose standard does not apply to the out-of-court identification by S.C.
¶25 Terry argues that under the standard set forth in Dubose , the identification made by S.C. as Terry sat on the curb with two other people must be suppressed because the showup was not necessary. He argues that even though Dubose defined "showup" as a procedure involving a suspect "presented singly to a witness for identification purposes," we must determine whether the procedure used here was necessary because "the circumstances surrounding that identification procedure made it the equivalent of a showup[.]" He argues that Terry was effectively presented "singly" to S.C. given that Terry "was the only person [of the three presented] wearing clothes similar to the description [S.C.] had given to police" and was the only one of the three with dreadlocks, which S.C. had also included in his description to police.
¶26 The standard Dubose established applies solely to a "showup," which it defines as when a suspect is presented singly to a witness for identification. Id. , ¶1 n.1. Where a suspect is not presented singly to a witness for identification, nothing in Dubose requires us to conduct the was-it-necessary analysis. Because this is not a situation governed by Dubose , we do not address the further arguments made by the parties concerning the necessity of the curbside identification.
C. The showup procedure employed here was not unnecessarily suggestive.
¶27 Terry argues that the procedure by which S.C.'s identification was obtained was impermissibly suggestive and unreliable, and therefore the identification should have been suppressed. He argues that the procedure was impermissibly suggestive because the detective directed S.C. "to pick from the suspects the person who he had seen do the shooting" and because police had made "no arrangements to minimize uniquely identifying features in the suspects" such as the fact that Terry was in light clothes and the other two were in dark clothes, and the fact that Terry had dreadlocks and the other two did not.
¶28 We reject the argument that the detective's statement to S.C. rendered the procedure impermissibly suggestive because S.C. testified that he did not feel pressured to identify anyone at all during the procedure and that he was not told who to identify. However, like the State, we note that best practice is for the officer to affirmatively instruct the witness who is presented with suspects that the shooter may or may not be among them.
¶29 Terry's argument as to his unique appearance is also unpersuasive. Our supreme court recognized that "[t]here have been cases which have declared that a photographic identification procedure which includes a photo which is unique in a manner directly related to an important identification factor may be held impermissibly suggestive." Powell , 86 Wis. 2d 51, 66-67. Powell cited Fells v. State , 65 Wis. 2d 525, 537, 223 N.W.2d 507 (1974) (overruled on other grounds by Dubose , 285 Wis. 2d 143, ¶¶26, 33, which added the necessity requirement for showups) and Schaffer v. State , 75 Wis. 2d 673, 250 N.W.2d 326 (1977) (overruled on other grounds by State v. Walker , 154 Wis. 2d 158, 453 N.W.2d 127 (1990) ). Powell also cited, as an example, United States v. Sanders , 479 F.2d 1193 (1973), "where the fact that defendant's photo was the only one in which the subject had facial hair in any way comparable to the initial eyewitness description," and the court concluded that this fact rendered the procedure impermissibly suggestive. The holdings in those cases, however, were in the context of photo array procedures in which police had full control over the presentation of target suspects. See Dubose , 285 Wis. 2d 143, ¶33 ("A lineup or photo array is generally fairer than a showup, because it distributes the probability of identification among the number of persons arrayed, thus reducing the risk of a misidentification."). Holdings about what makes a photo array impermissibly suggestive cannot practically be applied to an out-of-court identification with multiple suspects at a crime scene. Those holdings do not mean that in circumstances such as these, police are required to present the targets along with other suspects in similar clothing and with similar hairstyles in order to obtain an admissible witness identification.
¶30 The prohibition on "impermissibly suggestive" identification procedures merely imposes limitations on the manner in which police conduct investigations. See id. , ¶34 (stating that even procedures that are less fair than lineups or photo arrays "have been a useful instrument in investigating and prosecuting criminal cases, and there will continue to be circumstances in which such a procedure is necessary and appropriate"). Dubose gave examples of circumstances that would "carry with them inferences of guilt, and thus should be considered suggestive": presenting a suspect to a witness in a police station or in a squad car, or presenting a suspect who is "in handcuffs that are visible to any witness." See id. , ¶35. Police did not employ those suggestive tactics when they presented Terry and the other two suspects to S.C. There is no authority for the proposition that what police did rendered the procedure here impermissibly suggestive.
II. The postconviction court did not err in denying Terry's motion for postconviction relief without a hearing because Terry has not shown that trial counsel's failure to present expert testimony about eyewitness identification prejudiced him.
A. Standard of review.
¶31 It is well-established that for a successful ineffective assistance of counsel claim, the defendant bears the burden of proving both that his lawyer was deficient and that the deficient representation prejudiced the defendant. State v. Allen , 2004 WI 106, ¶26, 274 Wis. 2d 568, 682 N.W.2d 433. The Sixth Amendment does not guarantee perfect representation. See State v. Williquette , 180 Wis. 2d 589, 605, 510 N.W.2d 708 (Ct. App. 1993). For representation to be deficient, it must consist of "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Allen , 274 Wis. 2d 568, ¶26 (citation omitted). To prove prejudice, a defendant must show that there is a reasonable probability that but for the deficiency, the result of the proceedings would have been different. Id. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.
¶32 We review an ineffective assistance claim as a mixed question of law and fact. See State v. Kimbrough , 2001 WI App 138, ¶27, 246 Wis. 2d 648, 630 N.W.2d 752. "We will not reverse the trial court's factual findings unless they are clearly erroneous," but we review the effectiveness and prejudice questions independently of the trial court. See id.
B. There is not a reasonable probability that the result of the proceeding would have been different but for the failure to present an expert opinion on the reliability of eyewitness identification.
¶33 Terry argues that the lack of testimony from an eyewitness identification expert would have cast doubt on key eyewitness identifications of Terry. Terry points out that Carter, Thomas, and S.C. all testified that Terry shot Elliot. He dismisses Carter's testimony's significance in light of her "countless credibility problems" and focuses on the ways that Thomas's and S.C.'s identifications could have been undermined. He argues that the expert would have presented reasons that there was a "possibility that [Thomas] misidentified Terry[,]" such as stress, divided attention, the presence of a gun, and the fact that he might have mistakenly identified Terry as the man in the alley because he had seen Terry with Carter at the gas station.
¶34 We agree with the analysis of the postconviction court, which found that the expert's report was "facially insufficient" because it did not offer an opinion about the accuracy of the identifications in this case. We agree with the postconviction court that there was "an extraordinary amount of circumstantial and eyewitness testimony" presented, that "the State presented seven witnesses at trial that offered similar, overlapping descriptions of, or positively identified the defendant as the shooter, including the defendant's own girlfriend." We agree that "the consistencies in the eyewitness testimony, the DNA evidence corroborating Tiffany Carter's testimony and providing a motive for the defendant's actions, the strength of [Thomas's] identification, the defendant's statements ... accusing the victim of hitting his 'girl' " are all reasons for concluding that there was no reasonable probability that the proffered expert testimony would have produced a different outcome. Like the postconviction court, we conclude that on this record Terry has not shown a probability of a different result if the expert testimony had been presented.
¶35 For these reasons, we affirm the judgment of conviction and the order denying Terry's postconviction motion for a hearing on his claim of ineffective assistance of counsel.
By the Court. -Judgment and order affirmed.
Not recommended for publication in the official reports.

The Honorable Stephanie Rothstein presided over the trial and entered the judgment. The Honorable Mark A. Sanders, the successor to Judge Rothstein's homicide court calendar, denied Terry's postconviction motion.

In Terry's postconviction motion for a new trial, he identified an expert on eyewitness identification whose testimony, he claims, would have provided the jury "with a professional, scientific explanation based in fact and empirical research as to how [two eyewitnesses who identified Terry as the shooter] could have independently been wrong in their identification of Terry." He alleged that certain factors undermined the two independent identifications, including the cross-race effect, confirmation bias, stress, divided attention, limited exposure times, and the presence of a gun.

"The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington , 466 U.S. 668, 694 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

We employ the pseudonym the parties used in their briefs for the surviving victim who witnessed the shooting. See Wis. Stat. Rule 809.86(4) (2015-16). All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

Terry argues that eyewitnesses in this case misidentified the shooter, and he points to certain factors that affect the reliability of an eyewitness's identification, such as when the witness is of a different race than the person being identified. Terry acknowledges that this factor would not have undermined the reliability of Thomas's identification of Terry because both men are African-American.

The witnesses who spoke to police are identified here only by their initials in the interest of protecting their safety.